**UNITED STATES DISTRICT COURT**          **EASTERN DISTRICT OF TEXAS**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| *versus* | § | CASE NO. 1:12-CR-01 (1) |
| | § | |
| CHARLIE JAMES MISHAW, III | § | |

## MEMORANDUM AND ORDER

Pending before the court is Defendant Charlie James Mishaw's ("Mishaw") *pro se* Motion for Modification/Reduction of Term of Imprisonment or Compassionate Release (#45). Mishaw seeks compassionate release based on his mother's and his wife's medical conditions claiming that he is the only available caregiver for both of them. The Government filed a Response in opposition to the motion (#49). Mishaw filed a Reply (#52) styled as a Motion Requesting the Motion for Modification/Reduction be Granted, as well as a Motion for Leave to Supplement Motion for Modification of Sentence and/or Compassionate Release (#56) and a Motion for Leave to Supplement Motion for Modification of Sentence or, in the Alternative, Compassionate Release (#58). United States Probation and Pretrial Services ("Probation") conducted an investigation and recommends that the court deny the motion. Having considered the Motion, the Government's Response, Mishaw's Reply and supplemental filings, Probation's recommendation, the record, and the applicable law, the court is of the opinion that the motion should be denied.

I.    Background

On January 11, 2012, a federal grand jury in the Eastern District of Texas returned a two-count Indictment charging Mishaw in Count One with Car Jacking, in violation of 18 U.S.C. § 2119, and in Count Two with Possession of a Firearm in Furtherance of a Crime of Violence, in violation of 18 U.S.C. § 924(c)(1). Mishaw pleaded guilty to the offense charged in Count Two

of the Indictment on February 21, 2012, pursuant to a non-binding plea agreement. Count One was dismissed on the motion of the United States. On June 12, 2012, United States District Judge Ron Clark sentenced Mishaw to 84 months' imprisonment, to run consecutively to any other term of imprisonment imposed, followed by a three-year term of supervised release. Mishaw was placed in the custody of the Federal Bureau of Prisons ("BOP") on November 2, 2022, after being granted parole with respect to a related state sentence. Mishaw is presently incarcerated at Federal Correctional Institution Pollock ("FCI Pollock"), located in Pollock, Louisiana. Mishaw's projected release date is November 29, 2028.

## II.    Compassionate Release

A judgment of conviction that imposes a sentence of imprisonment is a "'final judgment' and may not be modified by a district court except in limited circumstances." *Dillon v. United States*, 560 U.S. 817, 824 (2010) (quoting 18 U.S.C. § 3582(b)); *see* 18 U.S.C. § 3582(c). Section 3582(c)(1)(A) embodies a rare exception to a conviction's finality. This statute gives the court discretion, in certain circumstances, to reduce a defendant's term of imprisonment. The First Step Act of 2018 ("the Act"), Pub. L. No. 115-391, 132 Stat. 5194, in part, amended 18 U.S.C. § 3582(c)(1)(A), which currently provides:

> (A) the court, upon motion of the Director of the BOP, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the

factors set forth in section 3553(a)[1] to the extent that they are applicable, if it finds that—

> (i) extraordinary and compelling reasons warrant such a reduction; or

> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the [BOP] that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);

> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

18 U.S.C. § 3582(c)(1)(A). This provision is commonly referred to as "compassionate release." *See, e.g.*, *United States v. Escajeda*, 58 F.4th 184, 186 (5th Cir. 2023) ("We often refer to this as 'compassionate release' because courts generally use it for prisoners with severe medical exigencies or infirmities.").

Rather than define "extraordinary and compelling reasons," Congress elected to delegate its authority to the United States Sentencing Commission ("Commission"). *See* 28 U.S.C. § 994(t) (directing the Commission to "describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples"); *United States v. Jean*, 108 F.4th 275, 278 (5th Cir. 2024), *abrogated on other grounds by United States v. Austin*, 125 F.4th 688, 692 (5th Cir. 2025); *United States v. Jackson*,

---

[1] Section 3553(a) directs courts to consider: the nature and circumstances of the offense and the defendant's history and characteristics; the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; the need to deter criminal conduct; the need to protect the public; the need to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; the kinds of sentences and sentencing ranges established for defendants with similar characteristics under applicable Guidelines provisions and policy statements; any pertinent policy statement of the United States Sentencing Commission in effect on the date of sentencing; the need to avoid unwarranted disparities among similar defendants; and the need to provide restitution to the victim. 18 U.S.C. § 3553(a).

27 F.4th 1088, 1090 (5th Cir. 2022); *United States v. Cooper*, 996 F.3d 283, 287 (5th Cir. 2021); *United States v. Shkambi*, 993 F.3d 388, 392 (5th Cir. 2021). Although the Commission issued a policy statement prior to the passage of the Act that described the reasons that qualify as extraordinary and compelling, that policy statement referenced only those motions filed by the Director of the BOP—thus, the United States Court of Appeals for the Fifth Circuit and other courts held that it was inapplicable to motions filed by defendants on their own behalf. *See Jackson*, 27 F.4th at 1090; *Cooper*, 996 F.3d at 287-88; *Shkambi*, 993 F.3d at 392.

Effective November 1, 2023, the Commission—responding to, among other things, the Act—amended the Guidelines to extend the applicability of the policy statement set forth in U.S.S.G. § 1B1.13 to defendant-filed motions and to broaden the scope of what qualifies as "extraordinary and compelling" reasons potentially warranting compassionate release. *See* U.S.S.G. § 1B1.13. Section 1B1.13(b), as amended, identifies six categories of circumstances that may qualify as "extraordinary and compelling." *Id*. § 1B1.13(b). These categories are:

(1) the medical circumstances of the defendant;

(2) the age of the defendant;

(3) the family circumstances of the defendant;

(4) whether the defendant was a victim of abuse while in custody;

(5) other reasons similar in gravity to those previously described; and

(6) an unusually long sentence.

*Id*. § 1B1.13(b)(1)-(6).

As a result, a prisoner seeking compassionate release on his own motion must satisfy the following hurdles:

4

(1)    the defendant must have exhausted his administrative remedies;

(2)    "extraordinary and compelling reasons" must justify the reduction of his sentence or he must satisfy the requirements of § 3582(c)(1)(A)(ii);

(3)    the reduction must be consistent with the Commission's applicable policy statements; and

(4)    the defendant must convince the court to exercise its discretion to grant the motion after considering the § 3553(a) factors.

*See Jackson*, 27 F.4th at 1089; *Shkambi*, 993 F.3d at 392; *accord United States v. Rollins*, 53 F.4th 353, 358 (5th Cir. 2022); *see Austin*, 125 F.4th at 692.

A.    Exhaustion of Administrative Remedies

Section 3582(c)(1)(A)'s plain language makes it clear that the court may not grant a defendant's motion for compassionate release unless the defendant has complied with the administrative exhaustion requirement.  18 U.S.C. § 3582(c)(1)(A); *United States v. Garrett*, 15 F.4th 335, 337 (5th Cir. 2021) ("[T]o file a proper motion for compassionate release in the district court, a prisoner must first exhaust the available administrative avenues."); *United States v. Franco*, 973 F.3d 465, 467 (5th Cir. 2020) (holding that the statutory requirement that a defendant file a request with the BOP before filing a motion for compassionate release in federal court "is *not* jurisdictional, but that it *is* mandatory").  Accordingly, before seeking relief from the court, a defendant must first submit a request to the warden of his facility to move for compassionate release on his behalf and then either exhaust his administrative remedies or wait for the lapse of 30 days after the warden received the request.  18 U.S.C. § 3582(c)(1)(A); *Garrett*, 15 F.4th at 338 ("[A]n inmate has two routes by which he may exhaust his administrative remedies.  Both begin with 'requesting that the [BOP] bring a motion on the defendant's behalf.'" (quoting *Franco*, 973 F.3d at 467)).

Although this requirement is said to be mandatory, the Fifth Circuit has treated it as "a nonjurisdictional claim-processing rule." *Franco*, 973 F.3d at 468. "Mandatory but nonjurisdictional procedural filing requirements may be waived." *United States v. McLean*, Nos. 21-40015, 21-40017, 2022 WL 44618, at *1 (5th Cir. Jan. 5, 2022); *see United States v. Harden*, No. 4:11-CR-127-SDJ, 2025 WL 562716, at *5 (E.D. Tex. Feb. 20, 2025). Therefore, if the Government fails to "invoke § 3582(c)(1)(A)'s exhaustion requirement as a basis for denying relief," that argument is deemed waived. *Id*.

A defendant's motion for compassionate release must be based on the same circumstances as those raised in his request for release to the warden of the facility where he is housed. *United States v. Dodd*, No. 4:13-CR-182-SDJ, 2020 WL 7396527, at *2 (E.D. Tex. Dec. 17, 2020) (stating that "[i]n order to exhaust her administrative remedies, a prisoner must first present to the BOP the same grounds warranting release that the prisoner urges in her motion"); *accord United States v. Thomas*, No. 4:19-CR-28-SDJ, 2023 WL 5279457, at *5 (E.D. Tex. Aug. 16, 2023) (citing *United States v. Mendoza-Garibay*, No. 4:13-CR-00281, 2023 WL 307459, at *1 (E.D. Tex. Jan. 18, 2023)). Hence, the facts asserted in an inmate's request to the warden and in his motion for compassionate release must be consistent. *United States v. Scott*, No. CR 17-114, 2024 WL 2187849, at *2 (E.D. La. May 14, 2024); *see United States v. Gonzalez*, 849 F. App'x 116, 117 (5th Cir. 2021). Further, "the exhaustion requirement applies to new arguments or grounds for compassionate release developed after an earlier request for compassionate release." *United States v. Cantu*, No. 7:17-cr-01046-2, 2022 WL 90853, at *1 (S.D. Tex. Jan. 5, 2022) (citing *United States v. Rivas*, 833 F. App'x 556, 558 (5th Cir. 2020)); *accord Mendoza-Garibay*, 2023 WL 307459, at *2.

Here, Mishaw contends that he has exhausted his administrative remedies. As the Government points out, however, the record reveals that he has exhausted his administrative remedies only with respect to his claim based on his mother's medical condition. Mishaw attached documentation to his motion indicating that he submitted multiple requests seeking compassionate release to prison staff based on his mother's medical problems. On April 24, 2023, he submitted an Inmate Request to Staff stating, "I'm requesting to be released on compassionate release due to my mother['s] illness of cancer, and mild heart attack[s]" so that "I can be there to help take care of my mom." Warden C. Garrett denied his request on May 24, 2023. On August 8, 2023, Mishaw made an Informal Resolution Attempt in which he again requested compassionate release due to his mother's illnesses of cancer and mild heart attacks. On August 15, 2023, Mishaw's counselor, L. Gremillion, and his unit manager, M. Carter, responded to the request stating, "Reviews for Compassionate Release can only be conducted by the Warden, and cannot be addressed appropriately at the informal resolution level." On August 16, 2023, Mishaw submitted a Request for Administrative Remedy again seeking compassionate release based on his mother's illnesses of cancer and mild heart attacks so that he could be there to help take care of her. On August 18, 2023, the Administrative Remedy Coordinator at FCI Pollock rejected his administrative remedy request and returned it to him, noting that he needed to submit his denial letter from the warden. Handwritten notes appearing at the bottom of this document indicate that it was returned with the requested documents on August 30, 2023. Investigative notes from FCI Pollock dated September 1, 2023, acknowledge that Mishaw's prior request for compassionate release was denied by the warden on May 24, 2023. Specifically, the notes state, "Warden previously denied – no new information not considered by previous denial was submitted." On

September 27, 2023, Acting Warden C. Humphrey denied Mishaw's Request for Administrative Remedy seeking compassionate release "due to your mother's various medical conditions and you providing care for her."  Mishaw's Administrative Remedy Appeal with regard to his request for care for his mother was denied on October 26, 2023, by Regional Director Heriberto H. Tellez.  Finally, on January 10, 2024, Timothy Barnett, the Administrator of National Inmate Appeals denied his reduction in sentence request to care for his "elderly ailing mother."  None of Mishaw's numerous requests for compassionate release and appeals mentions any illness or medical conditions of his wife or the need to serve as her caregiver.

Therefore, although Mishaw has exhausted his administrative remedies regarding his mother's medical condition and his desire to serve as her caregiver, he has not exhausted his administrative remedies regarding his wife's medical condition because he did not seek compassionate release based on her circumstances in his requests to the warden of the facility where he is housed.  Thus, Mishaw is foreclosed from obtaining relief with regard to his wife's medical condition and his desire to care for her.  Nevertheless, nothing in his motion indicates that extraordinary and compelling reasons exist to release Mishaw from confinement or reduce his sentence based on either his mother's or his wife's medical status.

B.    Criteria for Release—Family Circumstances

Mishaw contends that his family circumstances present extraordinary and compelling reasons that justify compassionate release.  With respect to a defendant's family circumstances, § 1B1.13(b)(3) provides that extraordinary and compelling reasons exist under any of the following circumstances or a combination thereof:

> (A)    The death or incapacitation of the caregiver of the defendant's minor child or the defendant's child who is 18 years of age or older and

> incapable of self-care because of a mental or physical disability or a
> medical condition.
>
> (B)     The incapacitation of the defendant's spouse or registered partner
>         when the defendant would be the only available caregiver for the
>         spouse or registered partner.
>
> (C)     The incapacitation of the defendant's parent when the defendant
>         would be the only available caregiver for the parent.
>
> (D)     The defendant establishes that circumstances similar to those listed
>         in paragraphs (3)(A) through (3)(C) exist involving any other
>         immediate family member or an individual whose relationship with
>         the defendant is similar in kind to that of an immediate family
>         member, when the defendant would be the only available caregiver
>         for such family member or individual.   For purposes of this
>         provision, "*immediate family member*" refers to any of the
>         individuals listed in paragraphs (3)(A) through (3)(C) as well as a
>         grandchild, grandparent, or sibling of the defendant.

U.S.S.G. § 1B1.13(b)(3).

In the context of § 1B1.13(b)(3), one is incapacitated, whether due to injury or illness, when he is "deprive[d] of capacity or natural power," such that he is unable to provide self-care. *See Incapacitate*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/incapacitate; *see also United States v. Bautista*, No. 3:15-cr-02720-DMS, 2024 WL 3014637, at *3 (S.D. Cal. June 14, 2024) ("Generally, a person is incapacitated when he is 'completely disabled' and cannot care for himself."). Moreover, "[f]or guidance on what constitutes 'incapacitation,' courts have looked to [the BOP's] guidelines for handling inmate compassionate release requests." *United States v. Al Hunaity*, No. CR 18-723 (RBK), 2024 WL 982044, at *5 (D.N.J. Mar. 7, 2024); *see United States v. Watson*, No. 4:18-CR-40018-KES-1, 2024 WL 1093757, at *2 (D.S.D. Mar. 13, 2024) ("[C]ourts have relied on the BOP program statement in determining that 'incapacitation' requires that the family member have suffered a

severe injury or illness, leaving them incapable of acting as a caregiver."). "'Incapacitation' is defined as 'a serious injury, or a debilitating physical illness and the result of the injury or illness is that the [individual] . . . is completely disabled, meaning that the [individual] . . . cannot carry on any self-care and is totally confined to a bed or chair.'" *United States v. Collins*, No. 15-10188-EFM, 2020 WL 136859, at *4 (D. Kan. Jan. 13, 2020) (quoting U.S. DEP'T OF JUST., FED. BUREAU OF PRISONS, PROGRAM STATEMENT 5050.50 (Jan. 17, 2019)); *see United States v. Crider*, No. 6:14-cr-00044-GFVT-HAI-1, 2024 WL 1291492, at *2 n.1 (E.D. Ky. Mar. 26, 2024); *United States v. White*, No. CR16-40, 2021 WL 1721016, at *4 (E.D. La. Apr. 30, 2021).

Here, Mishaw, age 32, contends that his mother, Germaine Mishaw ("Germaine"), age 58, is suffering from "multiple debilitating medical conditions including a life-long seizure disorder, Epilepsy, Type-2 Diabetes and Stage 3 Breast Cancer." Mishaw submitted limited medical records regarding his mother. A record dated May 22, 2019, from a neurologist, M. Athari, M.D. ("Dr. Athari"), indicates that Germaine had a CVA (cerebrovascular accident) on 2013 from which she recovered gradually, but completely. In 2018, however, she had another stroke after which she had post-CVA seizure-like movements and became wheelchair bound. Nevertheless, she did not appear to be in acute distress. Dr. Athari also reported Germaine's past medical history to include CVA, brain aneurysm, hypertension, diabetes mellitus, and urinary tract infection. With regard to Germaine, Dr. Athari further noted, "She lives with her family at her own house and she has supportive physical and emotional care." On July 12, 2019, Dr. Athari reported that Germaine mentioned that she had 4 episodes of seizures since her last visit and had been taking Keppra to manage her seizures. On July 31, 2019, Germaine had an MRI of her brain at Baytown Open MRI. Shelly Bath, M.D., described her impression of the results as an

10

"Unremarkable MRI of the brain."  On August 16, 2019, Dr. Athari noted that Germain had experienced one seizure.  As a result, he increased her Dilantin prescription, continued her Keppra dosage, and added Klonopin.  The next medical record included is a report of a breast ultrasound performed on Germaine on July 25, 2022, which was highly suggestive of malignancy and showed a suspicious abnormality.  A needle biopsy performed at Christus Health on August 23, 2022, revealed invasive ductal carcinoma in Germaine's right breast and a lymph node that was positive for metastatic carcinoma.  A PET scan on September 16, 2022, at Baptist Hospital of Southeast Texas showed primary right breast carcinoma.  Germaine began a course of chemotherapy in September 2022 and had a mastectomy on January 11, 2023.  None of Germaine's medical records reflects that she ever experienced a heart attack, contrary to Mishaw's assertions in his requests for compassionate release submitted to BOP officials.  Her blood pressure readings on July 12 and August 16, 2019, were normal as was a reading recorded in an undated medical record completed after January 11, 2023.  Mishaw submitted no additional records concerning his mother's medical condition, and there is no indication that Germaine's breast cancer has returned.

Mishaw was incarcerated throughout this time period beginning in 2011, when he was committed to the Texas Department of Criminal Justice ("TDCJ") to serve a sentence of 13 years on related state charges.  While Mishaw claims to be the only available caregiver for his mother, or at least the only "willing" caregiver, the record reflects otherwise.  Germaine's medical records indicate that she has been wheelchair-bound since 2019, but throughout her medical struggles, some person or persons have routinely taken her to physicians for diagnosis and treatment, to X-ray and MRI facilities for imaging, and to hospitals for surgery and follow-up.  According to Mishaw's Presentence Investigation Report ("PSR"), he is the youngest of five children.  He has

three brothers and one sister, and his father is deceased.  Mishaw married his wife, Fallon Mishaw ("Fallon"), on February 29, 2024, at the BOP facility in Pollock, Louisiana.  He has fathered no children.  Fallon, age 32, reportedly has four children from previous relationships and works part-time at a hospice care facility.  Although Mishaw indicates that Fallon was diagnosed with a malignant peripheral nerve sheath tumor on January 20, 2022, her medical records reflect that it was removed on March 1, 2022.  While Fallon submitted a letter to the court dated May 12, 2025, in which she claims that she is having another surgery for a tumor on her right leg, no medical records confirming this assertion were submitted.  Probation notes all four of Mishaw's siblings reside in the Beaumont, Texas, area, where both Germaine and Fallon reside.  Moreover, Mishaw concedes that "while he has siblings who should be able to care for this mother," he claims "they have refused to do so," but he presents no evidence to this effect other than his own self-serving assertion.  The file contains no correspondence or affidavits from any of his siblings.  A letter from Mishaw's mother dated February 10, 2025, signed "Germaine Mishaw-Sharpe," states that her current husband repeatedly assaulted her, threatened her, and was verbally abusive.  Mishaw submitted incident reports from the Beaumont Police Department reflecting that "Germaine Yolonda Sharpe" reported that she was the victim of an assault on February 9, 2025, and the subsequent issuance of a protective order on February 10, 2025, but the name of the perpetrator is not included in the reports.  Assuming her current husband is the subject of those reports, the court agrees that he would not be a suitable caregiver for Germaine.

In his motion, Mishaw "acknowledges that he is not the only available caregiver for his mother or his spouse."  Indeed, in this instance, there is no evidence that Mishaw is the only available caregiver for his mother in view of his four older siblings who reside nearby and the lack

of a viable explanation as to why they cannot assist in her care. Moreover, there is no evidence that Mishaw has ever served as a caregiver for anyone, including Germaine and Fallon. He is the youngest of the children in his family, and he has no children or his own. Mishaw did not marry Fallon until 2024, and there is no suggestion in the record that he has ever lived with her as her spouse, her intimate partner, or in any other capacity. Fallon was 17 or 18 years old when Mishaw began his current period of incarceration in 2011, and there is no indication that he ever served as a caregiver for her or for any of her children who were not yet born.

Courts have often denied motions for compassionate release in similar circumstances. *See United States v. Lopez*, No. 23-50404, 2024 WL 244935, at *1 (5th Cir. Jan. 23, 2024) (noting that the defendant "failed to explain why his other siblings could not care for his parents"); *United States v. Garcia*, No. H-21-162-01, 2024 WL 2114311, at *2 (S.D. Tex. May 10, 2024) (stating that the defendant failed to "establish that his mother has no other family members, such as brothers or sisters, who can assist with her care" and explaining that the defendant's "conclusory assertion that his wife is unavailable as a caregiver [did] not meet his burden of proof"); *United States v. Watson*, No. 4:18-CR-40018-KES-1, 2024 WL 1093757, at *3 (D.S.D. Mar. 13, 2024) ("Without evidence that [the defendant] is the only available caregiver, the court cannot determine whether [the defendant]'s family circumstances give rise to 'extraordinary and compelling reasons' for her release."); *United States v. Wrice*, No. 10-cr-40065-JPG-1, 2023 WL 4030067, at *3 (S.D. Ill. June 15, 2023) (reasoning that the defendant had not "met her burden" where she "provide[d] no statements from other family members, no affidavits or letters from medical professionals, and no other verifiable evidence to show that she is the only caretaker available or that [her] stepfather requires a caretaker"); *United States v. Duprey,* No. CR 10-00101 (RK), 2024

13

WL 3873938, at *2 (D.N.J. Aug. 19, 2024) (observing that the defendant's mother "has multiple different caregivers who visit her a few times per week" and "has several other family members who live [nearby]"); *United States v. Yarbrough*, No. 2:06-CR-00203-1, 2023 WL 8614050, at *3 (W.D. Pa. Dec. 13, 2023) (given the defendant's close family group, the court found that the defendant was not the only person who could serve as his mother's caregiver, and "there was no testimony that obviated the facial availability of other family members as potential viable caregivers"); *United States v. Moore*, No. 14-209-2, 2020 WL 7024245, at *5 (E.D. Pa. Nov. 30, 2020) (finding the prisoner did not demonstrate he was his mother's "only available caregiver" in light of his sister's living with his mother and a cousin living nearby, pointing out that although they might feel overwhelmed because they had full-time jobs, they did not state that they were incapacitated or physically unable to care for his mother).  In *United States v. Burden*, the court rejected the defendant's motion for compassionate release in which he asserted that he was the only person able to provide full-time care to his mother and father, ages 77 and 99, who were unable to care for themselves.  No. 3:00-CR-00263, 2024 WL 94402, at *3 (D. Conn. Jan. 8, 2024).  The court pointed out that the defendant's sister, with the help of her nephew, were providing significant assistance to the defendant's parents, commenting that it was clear that the defendant was not the "sole caregiver" available.  *Id*.  The court elaborated, "[h]is sister and nephew have provided extraordinary care.  Given they have work and other obligations, as do many relatives of elderly persons, they could obtain caregivers."  *Id*.  This court reaches the same conclusion in the case at bar.

In any event, Mishaw has not shown that he would be a suitable caretaker for his mother if he were to be released.  As explained below, Mishaw has an extensive criminal history, a

14

history of mental health problems, and a lengthy history of drug and alcohol abuse. Thus, based on the current record before the court, Mishaw has not established that his family circumstances create "extraordinary and compelling reasons" justifying his release from imprisonment.

C.    Section 3553(a) Factors

The court further finds that compassionate release is not merited in light of the applicable factors set forth in 18 U.S.C. § 3553(a). *See* 18 U.S.C. § 3582(c)(1)(A) (requiring courts to consider the § 3553(a) factors before granting compassionate release); 18 U.S.C. § 3582(c)(2) (also requiring courts to consider the factors set forth in § 3553(a)); *United States v. Chavez*, No. 23-50684, 2024 WL 940263, at *1 (5th Cir. Mar. 5, 2024); *Rollins*, 53 F.4th at 358-59; *United States v. Shorter*, 850 F. App'x 327, 328 (5th Cir. 2021) (finding that the court did not abuse its discretion in denying compassionate release after balancing the § 3553(a) factors); *United States v. Keys*, 846 F. App'x 275, 276 (5th Cir. 2021); *Shkambi*, 993 F.3d at 392; *Thompson*, 984 F.3d at 435 n.11 (collecting cases); *United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020).

Here, Mishaw's offense of conviction entails his use of a firearm in furtherance of a crime of violence. On November 5, 2011, officers were dispatched to an apartment complex in Orange, Texas, in reference to a carjacking where they encountered the 69-year-old victim, Roberta Diabo ("Diabo"), who was visibly shaken. Diabo stated that as she drove up to the security gate at the complex, she observed a male subject, later identified as Mishaw, standing by a red truck near the main office. The truck was identified as a 1997 Chevrolet Tahoe which had recently been reported as stolen from Beaumont. Diabo explained that Mishaw was waving his arms, and she assumed his vehicle was disabled. As she rolled down her window to access the key pad, Mishaw approached her vehicle. He pointed a dark pistol at her, pressed it to her cheek, and demanded

15

she get out of the vehicle.  He also demanded her wallet which was lying on the front passenger seat.  Diabo cooperated, and Mishaw drove away in her vehicle, a silver 2010 Toyota Corolla. A description of the vehicle was broadcast to local law enforcement, and, within minutes, Mishaw was stopped by an officer in the nearby town of Bridge City.  Diabo was taken to the scene where she positively identified Mishaw as the person who had pointed a pistol at her and stolen her vehicle.  A search of Diabo's vehicle revealed a blue RG .22 caliber six-shot revolver under the front passenger seat which had an obliterated serial number.  There were five .22 caliber rounds and one spent .22 caliber casing in the revolver.  Diabo's wallet was not located, but a few cards from inside her wallet were recovered.  The items missing from her wallet included her driver's license, social security card, and birth certificate.  As set of keys belonging to the stolen Tahoe was located in Mishaw's pants pocket.  The vehicle was released to Diabo.

While still at the scene, Mishaw denied stealing the Toyota and claimed that Diabo was his aunt.  He later stated that the vehicle was part of a drug deal, maintaining that Diabo had approached him at a gas station that morning and asked for narcotics.  According to Mishaw, Diabo had told him that she did not have any money but would "rent" her vehicle to him in lieu of payment.  He maintained that he agreed to the arrangement and dropped her off at her apartment complex.  Diabo reported to the police that she never had a narcotics problem and had never seen Mishaw before that date.  Diabo was contacted the following day by a man and his wife who had found her wallet on the side of the road.  She met with the couple and recovered the missing items.

Mishaw's criminal history includes prior convictions for burglary of a vehicle, possession of cocaine, unauthorized use of a vehicle, burglary of a habitation, burglary of a vehicle, and

failure to identify (2x). He was convicted of aggravated robbery in 2012 in the District Court of Orange County, Texas, for the carjacking of Diabo described above and was sentenced to 13 years of imprisonment in the TDCJ. According to his PSR, Mishaw failed to comply with a previous term of probation in 2009, which led to its revocation. Mishaw subsequently committed numerous violations while released on parole in 2010, but his parole was never revoked. Mishaw also has a history of poly-substance abuse beginning at age 13 up to his arrest in 2011, including the daily use of marijuana, Xanax, and alcohol as well as the frequent use of PCP. Mishaw committed a prison disciplinary violation while incarcerated at FCI Pollock on April 20, 2024, at which time he was found to be in possession of a hazardous tool. He lost 41 days of good conduct time credit and forfeited commissary and email privileges for 90 days as a result. Mishaw was classified in 2024 as posing a medium risk for recidivism and had a security classification of medium.

"Compassionate release is discretionary, not mandatory, and [may] be refused after weighing the sentencing factors of 18 U.S.C. § 3553(a)." *Chambliss*, 948 F.3d at 693; *see Rollins*, 53 F.4th at 358-60 (upholding the denial of compassionate release of the defendant, who suffered from a "dire" medical situation stemming from a gunshot wound that required the amputation of his right leg and left him paralyzed, but deferring to the district court's balancing of the § 3553(a) factors, including the defendant's "history, the serious nature of his offense, and the danger his release would pose to the community at-large"); *United States v. Gharib*, No. 21-40779, 2022 WL 1565352, at *1 (5th Cir. May 18, 2022). Where, as here, a prisoner has engaged in "severe" criminal conduct and has an extensive criminal history, the district court has discretion to deny compassionate release under the circumstances. *Chambliss*, 948 F.3d at 693-94; *accord Rollins*, 53 F.4th at 358-60; *Gharib*, 2022 WL 1565352, at *1 (refusing to

consider the defendant's contention that extraordinary and compelling reasons justified compassionate release due to the defendant's no longer being subject to the career offender enhancement when the district court found that the § 3553(a) factors outweighed granting relief); *Keys*, 846 F. App'x at 276 (rejecting the defendant's argument that the court gave too much weight to his criminal history and finding that "a mere disagreement with the court's balancing of the § 3553(a) factors . . . is not a sufficient ground for reversal"). In *United States v. McKinney*, the court denied relief to a prisoner who had end-stage renal failure and had a portion of his foot amputated despite the Government's concession that the defendant had established an "extraordinary and compelling reason" within the meaning of § 3582(c)(1)(A)(i), finding that "granting compassionate release would not comport with the factors enumerated in Section 3553(a)." No. 19-00394-03, 2023 WL 2993020, at *1, 3 (W.D. La. Apr. 18, 2023). The court pointed to McKinney's extensive criminal history that included several drug convictions, firearm convictions, and simple battery. *Id*. at *3. The *McKinney* court noted that the inmate had repeatedly failed to comply with previous terms of probation and parole and clearly lacked respect for the law. *Id*. The court concluded that a reduction in sentence would not equate to a "just punishment" under Section 3553(a)(2)(A). The court expounded: "It is this court's belief that a reduced sentence simply would not reflect the seriousness of the offense, would not promote respect of the law, would not afford adequate deterrence to criminal conduct, and would not protect the public from further crimes of this Defendant." *Id*. This court has the same concerns in the case at bar.

Regarding Mishaw's history of drug abuse, courts are precluded from "lengthening a prison term in order to promote a criminal defendant's rehabilitation," but in the present case, the

court is deciding whether to reduce, not extend, a sentence. *Tapia v. United States*, 564 U.S. 319, 321 (2011); *see Chambliss*, 948 F.3d at 694. Here, Mishaw has a history of abusing marijuana, Xanax, PCP, and alcohol. Therefore, releasing Mishaw may facilitate his drug abuse, as he would gain unfettered access to illegal drugs and alcohol outside the BOP. In view of the nature and circumstances of his offense of conviction, his criminal history which includes acts of violence and a drug offense, and his history of substance abuse, the court cannot conclude that Mishaw's early release from prison would afford adequate deterrence or protect the public, as he continues to pose a danger to other persons and to the community as a whole.

In addition, granting Mishaw compassionate release would fail to provide just punishment for his offense and promote respect for the law. In *Chambliss*, the Fifth Circuit upheld the denial of compassionate release due to the defendant's not yet having served a sufficient portion of his sentence. 948 F.3d at 694. The district court determined that the defendant's terminal illness "constitute[d] 'an extraordinary and compelling reason for a sentence reduction' and that he '[did] not present a danger upon release,'" but denied release because "releasing [the defendant] after serving only 14 years of a 30-year sentence minimizes both the impact of [the defendant's] crime and seriousness of the offense." *Id.* at 693-94. "Moreover, the [district] court, citing the § 3553(a) factors, determined that requiring [the defendant] to serve the remainder of his sentence would 'provide just punishment for the offense' and 'afford adequate deterrence to criminal conduct.'" *Id.* at 694; *see Rollins*, 53 F.4th at 359-60; *Thompson*, 984 F.3d at 434-35 (observing that the courts that have granted compassionate release "largely have done so for defendants who had already served the lion's share of their sentences and presented multiple, severe, health concerns"); *accord United States v. Rodriguez*, 27 F.4th 1097, 1100 (5th Cir. 2022). Here,

releasing Mishaw after he has served only 32 months of his 84-month sentence of imprisonment would similarly minimize the impact of his crime and the seriousness of his offense as well as fall short of providing just punishment and adequate deterrence to criminal conduct. On balance, the § 3553(a) factors do not support Mishaw's release.

As the court noted in *United States v. Preston*, "[t]he best predictor of how [Defendant] will behave if he were to be released is how he has behaved when released in the past, and his track record is a poor one." No. 3:18-CR-307-K, 2020 WL 1819888, at *4 (N.D. Tex. Apr. 11, 2020) (quoting *United States v. Martin*, 447 F. Supp. 3d 399, 403 (D. Md. 2020)). Here, Mishaw's track record is similarly a poor one. In this instance, there is no reason to believe that Mishaw would not revert to his prior acts of violence, his possession of firearms, and his drug-abusing behavior if released from prison at this time. *See United States v. Wymer*, 573 F. Supp. 3d 1208, 1212 (N.D. Ohio 2021). Like the court in *United States v. Lewis*, this court concludes that "Defendant's current term of imprisonment was and remains appropriate." No. 17-CR-28-FPG, 2021 WL 4519795, at *3 (W.D.N.Y. Oct. 4, 2021). Mishaw committed a serious offense that justified his sentence, and the circumstances he now identifies do not render that sentence unjust or inequitable. *See id.*

III.    Conclusion

In sum, Mishaw has failed to satisfy his burden of showing the necessary circumstances to warrant relief under the statutory framework to which the court must adhere. The 84-month sentence of imprisonment imposed upon Mishaw for his offense of conviction comports with the 18 U.S.C. § 3553(a) factors, and he has adduced no extraordinary and compelling reasons to

lessen his sentence or justify his release from prison at this time. His family circumstances do not merit a reduction of sentence under these circumstances.

Accordingly, Mishaw's *pro se* Motion for Modification/Reduction of Term of Imprisonment or Compassionate Release (#45) is DENIED. Mishaw's Motion Requesting the Motion for Modification/Reduction be Granted (#52), his Motion for Leave to Supplement Motion for Modification of Sentence and/or Compassionate Release (#56), and Motion for Leave to Supplement Motion for Modification of Sentence or, in the Alternative, Compassionate Release (#58) are DENIED as moot.

SIGNED at Beaumont, Texas, this 7th day of July, 2025.

MARCIA A. CRONE
UNITED STATES DISTRICT JUDGE